**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| DOUGLAS B., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Case No. 3:24-CV-1519-MAB[1] |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM AND ORDER**

**BEATTY, Magistrate Judge:**

Plaintiff Douglas B. applied for Disability Insurance Benefits in November 2021, claiming disability due to a back injury, a knee injury, and breathing problems (Tr. at 136-142, 167). Plaintiff's application was ultimately denied in a written decision by ALJ Marcus Johns issued on July 11, 2023 (Tr. 13–28). ALJ Johns determined that Plaintiff had severe impairments, namely degenerative disc disease of the thoracic spine and morbid obesity, but that Plaintiff nevertheless retained the residual functional capacity ("RFC") to perform a full range of medium work and, therefore, was not disabled. There is no dispute that the ALJ's decision is the final decision of the Commissioner of Social Security (*see* Docs. 12, 19). Plaintiff is presently before the Court, represented by counsel, seeking review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Specifically,

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (*see* Doc. 9).

Plaintiff is challenging the ALJ's RFC formulation.[2]  For the reasons explained below, the ALJ's decision is reversed.

**THE EVIDENTIARY RECORD**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record contains only the facts necessary to provide an overview and to decide the issues raised by Plaintiff.

Plaintiff was born in October 1966 and was 55 years old on the alleged onset date of November 3, 2021 (Tr. 133). He was 5'6" tall and weighed between 260 pounds and 290 pounds (approximately) during the time period at issue (Tr. 167, 296).

Prior to the disability onset date, Plaintiff worked as a machine operator for over 20 years at Spartan Light Metals, an auto parts manufacturer, doing what the ALJ characterized as "very heavy work" (Tr. 22, 134, 159, 168). Plaintiff's job consisted of picking up parts off a conveyor belt, putting the part on a trim press, and then putting the part into a bin, over and over, approximately 500 times a day (Tr. 160, 185). He estimated that his job required him to walk and/or stand for seven to eight hours a day, to stoop for several hours, to handle big objects for seven hours, and reach for seven hours (Tr. 160, 185). He frequently lifted 10 pounds, and the heaviest weight he lifted was 50 pounds (Tr. 160, 185).

Plaintiff was involved in a car accident in 2015, which led to lingering, chronic

---

[2] Plaintiff's brief is at Doc. 12. The Commissioner's response brief is at Doc. 19. Plaintiff did not file a reply brief.

back pain and knee pain (Tr. 47, 292). He was able to continue working, in spite of his pain, following the accident. Medical records show that, at least as of 2020, he saw his primary care physician every three months for hypertension and back pain. In November 2020, Plaintiff characterized his low back pain as "essentially constant" and "moderate in intensity, aching, gnawing, and sharp" (Tr. 270). He rated his pain as a six out of ten and said that movement triggers the pain, while medication, topical analgesics, and rest helped relieve the pain (Tr. 272). He took one hydrocodone/acetaminophen at bedtime, which his doctor wrote "controls his symptoms" (Tr. 270, 272).

Medical records from February 2021 indicate that Plaintiff's discomfort was most prominent in the lumbar spine and he characterized it as "constant, moderate in intensity, and severe" (Tr. 267). His doctor noted that he has "some pain relief with narcotic pain medication" (Tr. 267). Later in 2021, Plaintiff's doctor noted that the one hydrocodone Plaintiff took at bedtime "was very effective" (Tr. 264), and "allows him to sleep well at night and able to hold gainful employment." (Tr. 261).

Things took a turn for the worse in October 2021, when Plaintiff tested positive for RSV (Tr. 258–60, 278–79). Plaintiff testified that he was coughing practically non-stop, around the clock (Tr. 49). He said he would cough so hard that he would see stars (Tr. 49). He theorized that all of the intense coughing pushed his back pain "over the edge" and took it to "another level" (Tr. 49). Plaintiff said he was off work for a week or so with RSV and then tried to go back to work (Tr. 50). His said on his first day back he was bent over trying to catch his breath and almost in tears because his back hurt so bad; his floor boss sent him home (Tr. 50, 51). He tried to go back the next day, but "just absolutely

couldn't stand it anymore . . . just couldn't do it" because of his pain and breathing issues (Tr. 50). November 3, 2021, which is his alleged disability onset date, was the last day he worked (Tr. 62).

Notes from a November 23, 2021, visit with his physician indicate that Plaintiff takes one hydrocodone tablet at bedtime, which "allows him to sleep well at night and able to hold gainful employment" (Tr. 255–57), even though Plaintiff was no longer working by the date of this appointment. Plaintiff filed for disability on November 28, 2021 (*see* Tr. 62). In February 2022, Plaintiff's physician noted that the one hydrocodone tablet that Plaintiff takes at bedtime "allows him to sleep well at night and maintain ADLs" (Tr. 252).

Plaintiff filled out a Pain Questionnaire and a Function Report in March 2022, in connection with his disability application (Tr. 172–83). Plaintiff stated that his pain was located between his shoulder blades, in his lower back, and his knees (Tr. 172). He said the pain was so bad he could barely walk to his car after work, and it woke him up throughout the night, "hurting and aching so bad [he] wanted to scream" (Tr. 172). He said that the pain in his back never goes away, and it gets worse when he does any activity or is on his feet (Tr. 172). Lifting, standing, sitting, and reaching all cause or increase his pain (Tr. 172). He said he has "realized [he] cant lift anything anymore" (Tr. 172). He rotates between standing, sitting, and laying because he "cant do any for long" (Tr. 172, 181). He said he could walk 100 yards if he had to, but he would be up all night in pain (Tr. 181). Plaintiff indicated that he takes hydrocodone/acetaminophen 5-325mg for his back pain (Tr. 169, 173), plus ibuprofen and acetaminophen throughout the day (Tr. 173).

He also uses a spray, a topical foam, arthritis cream, and a vibrating hot pad, which all "help a little" but never completely take away the pain (Tr. 173).

Plaintiff stated his activities were restricted due to his pain (Tr. 173). He used to lead a very active life, doing home maintenance, traveling, cooking big meals, going to concerts and movies, camping, etc. (Tr. 173 178, 180). But he never (or hardly ever) does those things anymore due to his pain (Tr. 180). He said his social life is "basically over" and he spends most of the day in a recliner watching TV, with pillows under his arms and under his knees to take pressure off his back (Tr. 177, 180). He gets up to use the bathroom, make himself something to eat, and to let his dogs out, and sometimes he goes outside if the weather permits (Tr. 177). He is still able to do his own laundry, but he no longer does yard work (Tr. 178). He still drives but riding in a car for more than 25 or 30 minutes aggravates his back (Tr. 173, 178). He goes to the store about once a week; the entire round trip takes less than an hour (Tr. 179)

In May 2022, Plaintiff's physician once again noted that the one hydrocodone Plaintiff takes at bedtime "allows him to sleep well at night and maintain ADLs" (Tr. 311). The note also indicated that "Patient is retired" (Tr. 311).

A consultative examination was performed by Dr. Adrian Feinerman on June 30, 2022 (Tr. 292–300). The exam lasted 35 minutes (Tr. 298). Dr. Feinerman noted that Plaintiff has a history of back pain and knee pain since 2015 but has never had surgery (Tr. 292). On examination, Dr. Feinerman noted there was no anatomic deformity, or limitation of motion, of the cervical, thoracic, or lumbar spine (Tr. 297). Plaintiff walked normally without an assistive device and was able to walk 50 feet (*Id.*). Plaintiff had no

trouble getting on and off the exam table, tandem walking, standing on his toes, standing on his heels, squatting and rising, nor difficulty rising from a chair (Tr. 297). Plaintiff's muscle strength was normal throughout his body, and there was no spasm or atrophy (Tr. 297). Plaintiff's deep tendon reflexes were normal and equal (*Id.*). And the SLR test was negative in both sitting and supine positions (*Id.*).

Plaintiff's disability application was denied on July 12, 2022 (Tr. 62–66). A state-agency consulting physician reviewed Plaintiff's medical records and determined that he had no medically determinable impairments (Tr. 63–64, 65). Accordingly, it was determined that Plaintiff was not disabled (Tr. 65). At the reconsideration level, (*see* Tr. 67–71), another state-agency consulting physician determined that Plaintiff had one or more medically determinable impairments but they were not severe (Tr. 70). She indicated that Plaintiff's impairments were reasonably expected to cause pain and "some limitations in function," but Plaintiff's statements about the severity of his limitations was "not entirely supported by the objective findings in the file" (Tr. 70). No opinion as to Plaintiff's Residual Functional Capacity was offered (Tr. 71). It was once again determined that Plaintiff was not disabled (Tr. 71).

At follow-up visits in August and November 2022, Plaintiff's physician continued to note that the one hydrocodone tablet "allows him to sleep well at night and maintain ADLs." (Tr. 315–18, 336–38). In February 2023, Plaintiff saved up money to pay for, and his physician ordered, an MRI of Plaintiff's thoracic spine (Tr. 333–35). The MRI report indicates that Plaintiff had diffuse bulges at multiple levels (T4-5, T5-6, T8-9, T9-10, and T10-11), a disc protrusion (herniation) at T7-8 that impinged on both T8 nerve roots and

caused mild narrowing of the central canal, and mild facetal arthropathy (arthritis)[3] of the lower and mid-thoracic areas (Tr. 325–26, 351). Notably, the MRI did not cover Plaintiff's lumbar spine, even though his complaints have historically been about lower back pain (*see* Tr. 325–26; *see also* Tr. 37–38).

A hearing before ALJ Marcus Johns was held on June 20, 2023, via telephone (Tr. 29–61). Plaintiff's attorney explained that the minimal amount of medical evidence was due to the fact Plaintiff does not have health insurance because he is unable to afford the premiums and deductible for private insurance, and he is not eligible for a medical card (Tr. 37; *see also id.* at 41–42). Additionally, Plaintiff was unaware of any free medical clinics within 20-30 miles of his residence (Tr. 42). Plaintiff paid for all of his medical care and prescriptions out of pocket (Tr. 42).

Plaintiff testified that his back pain is primarily in two places: between his shoulder blades and just above his butt (Tr. 54). He described feeling like "there's a belt tightened . . . right underneath my breasts on the bone" and "there's a spike [between his] shoulder blades . . . that goes all the way through" and "comes right out [in] front [in] the same place where that belt gets tight" (Tr. 51). He described a recent incident where he went to set a gallon of milk on the rail of the deck and his house, and the "place right between my shoulder blades . . . let loose" (Tr. 55–56). He said the pain went into his right arm and "it was on fire" and "tingling" (Tr. 56). He said the pain did not let up for weeks and he did not think he was going to be able to stand it another day (Tr. 56).

---

[3] *See* CLEVELAND CLINIC, *Facet Arthropathy*, https://my.clevelandclinic.org/health/diseases/facet-arthropathy (last visited March 27, 2026) ("Facet Arthropathy is arthritis in the small joints of your spine.")

Plaintiff said he told his doctor about the incident, and his doctor said it was likely caused by the nerve compression that showed on the MRI (Tr. 56). As for the lower back pain, Plaintiff said it does not go into his legs unless he sits for 20 minutes or so, and then he starts going numb below the waist (Tr. 54).

Plaintiff testified that he thought he could walk about a hundred yards (Tr. 51). He could stand for 20 minutes before he would need to sit down (Tr. 51). And he could sit in a hard chair for 15 to 20 minutes before needing to stand (Tr. 52). He said an average day consists primarily of sitting in his recliner and watching TV (Tr. 52). When he is in the recliner, he props his arms up with pillows to take the pressure off the spot between his shoulder blades (Tr. 52).

Plaintiff testified that, after the car wreck, he was initially taking four hydrocodone every day, but his doctor encouraged him to get off of them or at least reduce his usage because of tightening government regulations regarding the prescription of narcotics (Tr. 53). Plaintiff said he "pushed [him]self" to cut down to one to show the doctor how much pain he could take, but "one a day don't really cut it" (Tr. 53). He talked about the many times in his life he has dealt with pain and said his back pain is "just a different level. It just don't let up" (Tr. 53–54). He said the hydrocodone takes the edge off the pain enough where he can lay down in bed (Tr. 55). There have been times where he wanted to go to the hospital but didn't because of "the money situation" (Tr. 55).

## THE ALJ'S DECISION

To qualify for DIB, a claimant must prove that they became disabled as defined by the Social Security Act, which provides that a person is disabled if they have an "inability

to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); *see also* 20 C.F.R. § 404.1505.

Here, ALJ Johns followed the familiar five-step sequential analysis to reach the conclusion that Plaintiff was not disabled and could perform medium work (Tr. 13–28). *See* 20 C.F.R. § 404.1567(c) (defining medium work); *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021) (describing the five steps).

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of November 3, 2021 (Tr. 17). At step two, the ALJ found that Plaintiff's severe impairments included degenerative disc disease of the thoracic spine and morbid obesity (Tr. 17). At step three, the ALJ determined that Plaintiff's impairments, either alone or in combination, did not meet or medically equal a listed impairment (Tr. 18). The ALJ then assessed Plaintiff's residual functional capacity ("RFC") and found that, despite his limitations, Plaintiff retained the ability to perform a full range of medium work (Tr. 18). At step four, the ALJ concluded that based on his RFC, Plaintiff could no longer perform any of his past relevant work (Tr. 23). At step five, the ALJ determined, based on the testimony of the vocational expert, that given Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, including hand packager, store laborer, and cleaner (Tr. 24–25). Accordingly, the ALJ found that Plaintiff was not disabled (Tr. 25).

<u>ISSUES RAISED BY PLAINTIFF</u>

1.  Whether the ALJ "improperly formulated the residual functional capacity ("RFC") . . . [and] found Plaintiff was capable of medium exertional work in error."

2.  Whether the ALJ "erred by finding the medium level RFC without explanation as required by Social Security Ruling ('SSR') 96-8p . . . [and] in a manner inconsistent with the SSR 96-8p and case law."

3.  Whether the ALJ "failed to develop the record."

(Doc. 12, p. 1).

<u>DISCUSSION</u>

The scope of judicial review is limited to determining whether the ALJ applied the correct legal standard in reaching their decision, whether the ALJ's decision is supported by substantial evidence, and whether the ALJ "buil[t] an accurate and logical bridge from the evidence to [their] conclusion" that the claimant is not disabled. *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020) (internal citations omitted). In other words, "the ALJ must explain her decision in such a way that allows us to determine whether [they] reached [their] decision in a rational manner, logically based on [their] specific findings and the evidence in the record." *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011). The court reviews the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021).

All of Plaintiff's arguments attack the ALJ's formulation of his residual functional capacity ("RFC"). RFC is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms . . .

may cause physical or mental limitations or restrictions that may affect his or her capacity to do work- related physical and mental activities. SSR 96-8p, 61 Fed. Reg. 34474-01, 34475 (July 2, 1996). In other words, a claimant's RFC is "the maximum that a claimant can still do despite [their] mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1)). The ALJ must determine the claimant's RFC based on all the relevant evidence in the case record, which includes objective medical evidence, statements from medical sources, the claimant's own statements about symptoms and limitations, and observations from non-medical sources, like family, friends, neighbors, etc. 20 C.F.R. § 404.1545(a)(1), (3); *see also Craft*, 539 F.3d at 676. The ALJ must explain how the RFC accounts for and accommodates the claimant's limitations and how the evidence in the record supports the RFC. *See Martin v. Saul*, 950 F.3d 369, 374 (7th Cir. 2020) ("[T]he ALJ must account for the totality of a claimant's limitations in determining the proper RFC.") (internal quotation marks and citation omitted); *Ghiselli v. Colvin*, 837 F.3d 771, 779 (7th Cir. 2016) (ALJ must "build a logical bridge from the medical evidence to its conclusions regarding . . . [any] limitation attendant to its residual functional capacity determinations."); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (ALJ must "explain how she reached her conclusions about [claimant's] physical [and/or mental] capabilities.") (citing *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005)); Social Security Ruling 96-8p ("SSR 96-8p"), 1996 WL 374184, at *7 (July 2, 1996) ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion . . . .").

Here, the ALJ concluded that Plaintiff was not disabled because he retained the

residual functional capacity to perform a full range of medium work. The determination that Plaintiff is capable of medium work is critical in this case (*see* Doc. 12, p. 8; *see also* Tr. 38–39). At the time of the alleged onset date of disability in November 2021, Plaintiff was 55 years old. Given his age, his education, and the nature of his previous work, if Plaintiff was limited to light (or sedentary) work, he would be considered presumptively disabled under Rule 202.06 of the Medical-Vocational Guidelines ("Grids"). 20 C.F.R. Pt. 404, Subpt. P, App. 2, Sec. 202.00, Table 2, Rule 202.06. Thus, the question of whether Plaintiff can perform medium work is dispositive of disability.

In formulating the RFC, the ALJ was unpersuaded by the opinions of the non-examining consultants and the examining consultant, who all thought that Plaintiff had no work-related limitations (Tr. 23). The ALJ thought that Plaintiff's impairments "cause[d] more than minimal functional limitations" and that Plaintiff was no longer capable of doing the heavy work he did previously (Tr. 23). But the ALJ was not persuaded by Plaintiff's own statements that his limitations were disabling, finding that Plaintiff's statements were "inconsistent with the treatment history and objective evidence" (Tr. 21; *see also* Tr. 19). Specifically, the treatment records do not contain any objective signs or findings of any significance (Tr. 21, 22). The consultative exam was likewise "unremarkable" aside from elevated blood pressure (Tr. 21). The treatment records also do not contain any evidence of significant decline near the alleged onset date or documented complaints about difficulty returning to work, worsened back pain from coughing, or ongoing shortness of breath (Tr. 19). And there were no reports from the physician that Plaintiff was unable to work (Tr. 22). On the other hand, the treatment

Page 12 of 18

records consistently noted "significant benefits from conservative treatment—that is, that one hydrocodone allowed Plaintiff to sleep well and maintain his activities of daily living—and the records do not reflect that he ever sought any additional treatment, like physical therapy, pain managements, or injections, or voiced concerns about an inability to afford such services (Tr. 21, 22).

Having essentially rejected all of the evidence regarding Plaintiff's limitations, there was nothing the ALJ could point to that specifically showed Plaintiff *could* perform medium work. So the ALJ instead relied on what the evidence *did not* show, and he thought the evidence *did not* show that Plaintiff was *unable* to perform medium work (Tr. 23 ("No objective evidence justifies a conclusion that the claimant would be unable to persist at [a medium] level of activity"); *see also* Tr. 22 ("[T]here is no objective evidence in the record to support less than medium work abilities.")). The ALJ stated that the "residual functional capacity assessment . . . is supported by the longitudinal medical record . . . conservative treatment . . . findings in the consultative internal medicine examination and *imaging*, and the record" (Tr. 23) (emphasis added). The ALJ then added that "[t]he combination of the claimant's mild thoracic central spinal canal stenosis at one level and obesity supports a reduction to medium work" (Tr. 23).

Plaintiff takes issue with the ALJ's statement that the MRI results supported his finding that Plaintiff could sustain medium exertional work (Doc. 12, pp. 3–7). Plaintiff argues that the ALJ impermissibly "played doctor" and relied on his own lay interpretation of the MRI results. Plaintiff contends that the ALJ was required to obtain an updated opinion from a medical expert as to whether and how his spinal impairment

impacted his RFC (*Id.* at pp. 11–16).

The Commissioner, in response, contends that Plaintiff's argument overlooks that it is the ALJ's responsibility—not doctors—to assess a claimant's RFC, and that assessment does not have to be based on a medical opinion (Doc. 19, pp. 1, 6). The Commissioner further argues that the February 2023 MRI report was just one piece of evidence, among many, that the ALJ considered in determining Plaintiff's functional work limitations (*Id.* at pp. 7–8). The ALJ addressed the results of the MRI, but determined that Plaintiff's conservative treatment course and benign physical examinations still undermined his claim of total disability (*Id.* at pp. 2, 7–8). The Commissioner claims that Plaintiff has failed to show how the MRI imaging undermines the RFC determination (*Id.* at pp. 1, 8–9).

After reviewing the parties' briefs, the ALJ's decision, the evidence in the record, and the relevant case law, the Court agrees with Plaintiff. The Seventh Circuit has been very clear that an ALJ may not "play doctor" and interpret "new and potentially decisive medical evidence" without the assistance of a medical expert. *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) (citing *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (ruling that the ALJ erred in failing to submit claimant's first MRI in 11 years to medical scrutiny and in interpreting results herself)). Relatedly, an ALJ cannot "conclude, without medical input, that a claimant's most recent MRI results are 'consistent' with the ALJ's conclusions about her impairments." *McHenry*, 911 F.3d at 871 (citing *Akin v. Berryhill,* 887 F.3d 314, 317–18 (7th Cir. 2018)).

Here, neither the non-examining nor examining consultants reviewed the MRI

evidence; the MRI was not even completed until months after these consultants' involvement in Plaintiff's case. There is also nothing in the record indicating what Plaintiff's doctor thought of the MRI results because the results (along with a quick note about the results being relayed to Plaintiff) are the last medical records in the administrative record (Tr. 325–26, 351; *see* Doc. 10-7).[4] There are no records of any visits after the MRI was taken (*see* Doc. 10-7), despite the ALJ's erroneous contention otherwise (*see* Tr. 21, 22). That means there is no physician in the record who has opined on whether the MRI results are consistent with Plaintiff's claim of disabling pain. Therefore, the ALJ's statement that the MRI results were consistent with and supported an RFC assessment of medium exertional work appears to be based solely on his own interpretation of the test results, which is impermissible. *Akin*, 887 F.3d at 317 ("[W]ithout an expert opinion interpreting the MRI results in the record, the ALJ was not qualified to conclude that the MRI results were 'consistent' with his assessment.").

The ALJ's mistake requires reversal and remand, regardless of all the other reasons the ALJ gave for the RFC assessment, because the MRI results contained significant, new, and potentially decisive findings. It was the first and only imaging of Plaintiff's back, and

---

[4] *But see Bakke v. Kijakazi*, 62 F.4th 1061, 1067 n.2 (7th Cir. 2023) (holding ALJ did not impermissibly play doctor and interpret EMG or myelogram results post-dating agency physicians' review but rather relied on the expert interpretations of the tests from claimant's own treating physicians); *Durham v. Kijakazi,* 53 F.4th 1089, 1095 (7th Cir. 2022) (holding ALJ did not impermissibly play doctor and attempt to interpret the significance of medical tests and procedures that were not considered by agency consultants but rather relied on the conclusions of the claimant's treating physicians that her condition had not worsened); *DuCharme v. Kijakazi*, No. 21-2204, 2022 WL 3287974 (7th Cir. Aug. 11, 2022) (unpublished) (holding ALJ did not impermissibly play doctor and assess limitations of claimant's back pain without the help of medical expertise where the ALJ relied on opinions from claimant's treating physicians and claimant's own reports to his doctors about the alleviation of his pain).

it shed light on a considerable number of issues with Plaintiff's thoracic spine—five bulging discs, a sixth disc protruding and pressing on the central canal and nerve roots, and arthritis. These findings could reasonably change the reviewing consultants' opinions. *See Stage v. Colvin,* 812 F.3d 1121, 1125 (7th Cir. 2016) (non-examining physician's opinion was outdated where new MRI and treating physicians report showed that claimant had a significant hip deformity and needed a hip replacement); *Goins,* 764 F.3d at 680 (claimant's first MRI in eleven years was potentially decisive because it revealed changes that substantiated her complaints of worsening symptoms and headaches). *See also Baptist v. Kijakazi,* 74 F.4th 437, 443 (7th Cir. 2023) ("[E]ven evidence of 'mild' changes can be potentially decisive in certain circumstances.") (citing *Israel v. Colvin,* 840 F.3d 432, 439–40 (7th Cir. 2016) (ALJ was required to seek an updated opinion regarding an MRI showing "mild," "minor," and "minimal" spinal changes to determine whether it supported the claimant's reports of disabling pain)).

The Court suspects that it is highly likely the MRI results would change the agency consultants' opinion that Plaintiff had no medically determinable impairment of his spine. *See* Social Security Ruling 16-3P, 2016 WL 1119029, at *3 (Mar. 16, 2016) (requiring "objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce an individual's alleged symptoms."). After all, the MRI results convinced the ALJ that Plaintiff had a severe medical impairment of the spine. It is also possible that the consultants might think the imaging justified limitations on Plaintiff's ability to work; after all, the ALJ thought so. And again, if the consultants through Plaintiff was limited

to light or sedentary work, then he would be deemed disabled because of his age.

The MRI results may corroborate Plaintiff's complaints of disabling pain, or they may lend support to the ALJ's original interpretation. But either way, the ALJ was not qualified to conclude that the MRI results were consistent with his RFC assessment of medium exertional work without an expert opinion interpreting the results. Because the ALJ impermissibly interpreted the MRI results himself, the ALJ's decision must be reversed and the case remanded to the agency.

Having concluded that remand is necessary, in the interest of judicial economy the Court declines to address Plaintiff's other arguments. Plaintiff may raise his other concerns on remand if he deems it appropriate to do so.

The Court wishes to emphasize that this Order should not be construed as an indication that it believes the ALJ was required to reach a certain conclusion about the credibility of Plaintiff's testimony or the severity of his symptoms, or that Plaintiff is entitled to benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## CONCLUSION

The Commissioner's final decision denying Plaintiff Douglas B.'s application for Social Security Disability Insurance Benefits is **REVERSED** and **REMANDED** to the Commissioner, pursuant to sentence four of 42 U.S.C. §405(g), for further proceedings consistent with this Order. The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED: March 31, 2026**

s/ Mark A. Beatty
MARK A. BEATTY
United States Magistrate Judge
